# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| KELSEY LEROY BECKETT; <br><br> Plaintiff, <br><br> vs. <br><br> UNKNOWN POLICE OFFICER[1] in his individual capacity, <br><br> Defendant. | Case No. 18-CV-117-KEM <br><br> **MEMORANDUM OPINION AND ORDER** |

Currently pending before the court are Defendant's motions for summary judgment and to strike Plaintiff's resistance in response thereto. Docs. 64, 71. I **deny** the motion to strike (Doc. 71) but **grant** the motion for summary judgment (Doc. 64).

## I. MOTION TO STRIKE

On March 26, 2021, Defendant filed a motion for summary judgment, as well as a supporting brief, statement of undisputed facts, and appendix. Docs. 64, 64-1, 66, 67. Three weeks later, on April 16, 2021, Plaintiff filed a resistance, statement of additional material facts, and appendix. Docs. 69, 69-1, 69-2, 69-3. Plaintiff did not file a response to Defendant's statement of facts, as required by Local Rule 56(b)(2). That rule provides that "[t]he failure to respond to an individual statement of material fact, with appropriate appendix citations, may constitute an admission of that fact." LR 56(b). Thus, on April 23, 2021, the date Defendant filed his reply, Defendant also filed a motion to strike Plaintiff's resistance, appendix, and statement of additional facts, arguing that the case-dispositive facts contained in Defendant's statement of facts should be deemed admitted

---

[1] The parties agree that Defendant "Unknown Police Officer" refers to Cedar Rapids police officer Shawn Hall.

based on Plaintiff's failure to respond. Doc. 71. A few hours later that same day, Plaintiff filed a resistance to the motion to strike, noting that counsel for Plaintiff had prepared a response to Defendant's statement of facts by the deadline but "[a]pparently, it was not filed." Doc. 72. Plaintiff attached the response to Defendant's statement of facts. Doc. 72-1.

"District courts have broad discretion to set filing deadlines and enforce local rules." *Iowa Great Lakes Sanitary Dist. v. Travelers Cas. & Sur. Co. of Am.*, No. C15-4252-LTS, 2017 WL 4711438, at *1-2 (N.D. Iowa July 7, 2017) (quoting *Reasonover v. St. Louis Cnty., Mo.*, 447 F.3d 569, 579 (8th Cir. 2006)), *aff'd,* 913 F.3d 760 (8th Cir. 2019). The court may extend a deadline after its expiration upon a showing of excusable neglect and good cause. **Fed. R. Civ. P. 6(b)(1)(B)**. Excusable neglect "does not require a showing that the party was without fault." *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 857 (8th Cir. 2010); *Mullen v. Heinkel Filtering Sys., Inc.*, No. C12-2084, 2013 WL 4766785, at *2 (N.D. Iowa Sept. 4, 2013) ("[E]xcusable neglect . . . is not limited strictly to omissions caused by circumstances beyond the control of the movant." (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 394 (1993))). Excusable neglect may "encompass situations in which the failure to comply with a filing deadline is attributable to negligence." *Ceridian Corp. v. SCSC Corp.*, 212 F.3d 398, 403-04 (8th Cir. 2000) (quoting *Pioneer*, 507 U.S. at 394). "[W]hether neglect is excusable is at bottom an equitable one, taking account of all relevant circumstances surrounding the party's omission." *Kurka v. Iowa Cnty.*, 628 F.3d 953, 959 (8th Cir. 2010) (quoting *Pioneer*, 507 U.S. at 394). Courts consider the following factors: "(1) the possibility of prejudice to the defendant, (2) the length of delay and the potential impact on judicial proceedings, (3) the reason for the delay, including whether the delay was within the party's reasonable control, and (4) whether the party acted in good faith." *Id.* The third factor, the excuse given for the delay, carries the most weight. *Gibbons v. United States*, 317 F.3d 852, 854 (8th Cir. 2003). The court considers similar factors when determining

whether good cause to extend a deadline exists, with the "primary measure of good cause" being "the movant's diligence." *Albright ex rel. Doe v. Mountain Home Sch. Dist.*, 926 F.3d 942, 951 (8th Cir. 2019) (quoting *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)).

Here, the court construes Plaintiff's resistance to the motion to strike as a motion to extend the deadline. Given the speed with which Plaintiff responded to Defendant's motion to strike, the court credits Plaintiff's assertion that Plaintiff timely prepared the response to the statement of facts but neglected to file it, only realizing the error upon seeing Defendant's motion to strike. Plaintiff did not act in bad faith. Plaintiff ultimately filed the response only one week late, and the court's consideration of the response will not delay the proceedings or prejudice either party, especially because Plaintiff's statement of additional facts, which were timely filed, made clear Plaintiff's opposition to Defendant's statement of facts and the evidence Plaintiff relied on (Plaintiff's deposition testimony). The court finds good cause and excusable neglect exist to extend the deadline. *See Pineda v. Am. Plastics Techs., Inc.*, No. 12-21145-CIV, 2014 WL 1946686, at *5-6 (S.D. Fla. May 15, 2014) (noting that a "mistake of fact" or "clerical error" is more likely to constitute excusable neglect than a mistake of law and holding that excusable neglect existed when counsel timely prepared a resistance that "was inadvertently not filed," "a prototypical clerical error that constitutes a mistake of fact"). Plaintiff's response to Defendant's statement of facts (Doc. 72-1) will be considered timely filed.

Defendant's motion to strike (Doc. 71) is therefore **denied**.

## II. *MOTION FOR SUMMARY JUDGMENT*
### A. *Background*

On November 8, 2016, Plaintiff Kelsey Leroy Beckett led law enforcement officers on a dangerous high-speed chase in which he also attempted to run over an on-foot police officer (Cedar Rapids police officer Mikel Wombacher). Def. SOF; Pl. Resp.

3

SOF.[2]  Officers ultimately stopped Beckett's vehicle by ramming it into a piece of construction equipment.  *Id.*  Beckett crawled out his car's window and fled on foot.  *Id.*  Officers and a police dog, K-9 Cooper, pursued Beckett.  *Id.*  K-9 Cooper bit Beckett as he ran in an attempt to stop him.  *Id.*  Eventually, officers caught up to Beckett and placed him under arrest, handcuffing him while he was lying on the ground on his stomach.  *Id.*  During the handcuffing process, "Beckett was being held down and [could not] see exactly what was going on."  Pl. SOF; Def. Resp. SOF.

At his deposition, Beckett testified that after he was handcuffed and subdued, Cedar Rapids police officer and K-9 handler Shawn Hall (Defendant "Unknown Police Officer") sicced K-9 Cooper on him.  Pl. App.  Beckett testified that leading up to that, Deputy Nicholas Bonifazi with the United States Marshals Service tackled Beckett to the ground and subdued him.  *Id.*  Beckett denied struggling, stating he did not resist and "just gave up" after the takedown.  *Id.*  He testified that he did not see Officer Hall until he was lying on his stomach on the ground, handcuffed, with Officer Bonifazi's knee on his back; at that time, K-9 Cooper sat calmly in front of him.  *Id.*  According to Beckett, Officer Wombacher was upset and yelling, and Deputy Bonifazi told Officer Wombacher to calm down.  *Id.*  Beckett testified that Officer Wombacher walked over to Officer Hall and spoke to him briefly, after which Officer Hall walked the dog around Beckett and sicced K-9 Cooper on him.  *Id.*  Beckett stated that K-9 Cooper bit him six additional times after he was handcuffed, in areas the dog had not previously bitten as part of the takedown (including his buttocks).  *Id.*  Beckett said he yelled to the officers to get the dog off him, and Deputy Bonifazi, who still had his knee to Beckett's back, said he had no control over the dog.  *Id.*

---

[2] "Def. SOF" refers to Defendant's Statement of Facts, filed at Doc. 66; "Pl. Resp. SOF" refers to Plaintiff's Response to Defendant's Statement of Facts, filed at Doc. 72-1; "Pl. SOF" refers to Plaintiff's Statement of Facts, filed at Doc. 69-2; and "Def. Resp. SOF" refers to Defendant's Response to Plaintiff's Statement of Facts, filed at Doc. 70.  "Def. App." refers to Defendant's Appendix, filed at Doc. 67; and "Pl. App." refers to Plaintiff's Appendix, filed at Doc. 69-3.

Defendant submitted declarations from officers on the scene that day disputing Beckett's testimony. Def. App. 67. Officer Hall and Deputy Bonifazi both stated in their declarations that Officer Hall reached Beckett first—Officer Hall stated that K-9 Cooper tripped Beckett to take him down, while Deputy Bonifazi said that "Hall reached Beckett and Beckett went to the ground" with Deputy Bonifazi only a few feet away. Def. App. 85, 91. Officer Hall stated that as Beckett fought with K-9 Cooper, Officer Hall placed himself on Beckett's back and threatened to shoot if he did not show his hands; Beckett complied, and Officer Hall ordered K-9 Cooper to drop his bite since Deputy Bonifazi and another officer, Cedar Rapids police sergeant Matthew Welsh, were nearby, and at least one of them had their weapon drawn (Deputy Bonifazi's declaration does not include this information). Def. App. 85, 91-92. Officer Hall stated that Beckett started to try to push himself off the ground and out from under Officer Hall, and K-9 Cooper bit Beckett's buttocks as Officer Hall struggled with the (unhandcuffed) Beckett. Def. App. 92. Officer Hall also stated that he did not know the "precise moment" when Deputy Bonifazi began assisting him in handcuffing Beckett, but that it took both officers and K-9 Cooper holding his bite to handcuff Beckett as he struggled (the parties agree that K-9 "Cooper is trained to apprehend targets on command by biting the target and holding his bite until commanded to release it"). Def. App. 93; Def. SOF; Pl. Resp. SOF. Deputy Bonifazi said that after he reached Beckett and Officer Hall's location, he placed his knee on Beckett's torso on the right side, while Officer Hall was on Beckett's left side, and the two officers worked together to handcuff Beckett as he fought against them, with K-9 Cooper's assistance on "the lower part of Beckett's body." Def. App. 85-86. Both Officer Hall and Deputy Bonifazi stated that Beckett yelled about the dog biting him as they tried to handcuff him, and Officer Hall stated he told Beckett the dog would drop his bite when Beckett stopped resisting. Def. App. 86, 92. Both officers stated that K-9 Cooper stopped biting Beckett within seconds of Beckett being handcuffed. Def. App. 86, 93. Both officers also stated that as soon as Beckett was handcuffed, Officer Hall

5

led K-9 Cooper back to his police vehicle, and K-9 Cooper did not return to the vicinity. *Id*.

Defendant also submitted a declaration from Officer Wombacher. Def. App 67. Officer Wombacher stated that by the time he reached the scene, Beckett was already handcuffed. Def. App. 81. He told Beckett that he was lucky because he almost shot him during the pursuit, and Deputy Bonifazi told Officer Wombacher to calm down. *Id*. Officer Wombacher stated that he then walked over to Sergeant Welsh and talked with him. *Id*. Officer Wombacher stated that he did not speak to Officer Hall or see K-9 Cooper attack Beckett after his apprehension. *Id*.

None of the police officers recorded body camera footage that day, but two squad cars (driven by Officer Robert Boyer and Officer David Zahn) captured video of the foot chase with an Arbitrator 360 audio-video recording system. The camera system provided four views outside the squad cars: front, driver side, rear window, and passenger side. Beckett's ultimate apprehension occurred behind a house, just blocked from the cameras' view, but considering the squad car videos *in toto* (which provide a 360 view of the goings-on outside the squad car), the videos show the officers' comings-and-goings to the scene behind the residence, as well as the officers on the fringes of the scene.

The declaration from Cedar Rapids police lieutenant Ryan Abodeely purports to identify the officers shown in the videos. Doc. 68; Def. SOF; Pl. Resp. SOF; Def. App. 95-105. Lieutenant Abodeely's identification of Officer Hall and Deputy Bonifazi arriving on the scene is undisputed. Def. SOF ¶¶ 25, 52, 57; Pl. Resp. SOF ¶¶ 5, 11, 13. The Boyer and Zahn videos show the following events:

- 9:35:20-9:35:22 (ZF)[3]: Beckett and K-9 Cooper run across the screen and disappear behind the (back left) corner of the house.

---

[3] The first letter (Z or B) refers to whether the video is taken from the Zahn or Boyer squad car; the second letter refers to whether the video is the front (F), rear (R), driver side (D), or passenger side (P).

6

- 9:35:23-9:35:26 (ZF): Three officers in quick succession (Officer Hall, Deputy Bonifazi, and a third[4]) run across the screen and behind the residence in pursuit of Beckett. Officer Hall is in uniform; Deputy Bonifazi and the third officer are wearing street clothes. Deputy Bonifazi and the third officer slow as they near off screen, and Deputy Bonifazi draws his weapon and points at something (presumably Beckett) off screen just behind the residence.

- 9:35:27-9:35:39 (ZF): The third officer remains stopped on screen and visible for about ten seconds, looking at something just behind the residence, before disappearing out of view.

- 9:35:23-9:35:40 (ZD, ZP): Officer Zahn (in uniform) exits his vehicle and rounds the back of his car toward the opposite side (right) of the residence. Officer Zahn walks across the front of the house (from left to right) and turns to walk down the right side of the residence toward the back of the house, disappearing off screen.

- 9:35:51-9:35:52 (ZF): The third officer[5] appears on screen from behind the residence, his focus remaining on the action taking place behind the residence, before disappearing back behind the residence.

- 9:35:40-9:35:58 (ZF, ZD): An officer in street clothes[6] (the fifth officer) walks from the street toward the back of the house along the left side, following the same path as Beckett and the three officers chasing him earlier.

- 9:35:43-9:35:55 (BF, BD): Officer Boyer (in uniform) arrives on scene and exits his vehicle, walking around the back of his car and toward the residence. As he rounds the back of his car, he breaks into a run, heading toward the left side of the residence.

---

[4] Lieutenant Abodeely identifies the third officer as Sergeant Welsh, but Beckett disputes that the videos are clear enough to conclusively identify which officer is shown.

[5] The third officer's clothing (not in uniform, untucked shirt) distinguishes him from the other officers behind the house.

[6] That the officer is wearing blue jeans (and not a uniform) is clearly visible at 9:36:28 (ZD).

- 9:35:59-9:36:22 (ZF, ZP): As the fifth officer reaches a point where he can see what is going on behind the house, Officer Boyer comes running toward him, slowing to a walk as he nears. After brief communication, Officer Boyer walks a few steps back in the direction he came from and radios dispatch that they "have him at a residence here." When dispatch asks if an ambulance is needed, he looks behind the house and says, "Just hold on for a second. It's kind of a-- We're still figuring this out."
- 9:36:06-9:38:11 (ZF, ZD, BP, BF): As Officer Boyer communicates with dispatch, the third officer comes from behind the residence and jogs along the left side of the house toward the front of the house and the squad cars, reaching the street around 9:36:14. The third officer remains near his car in the street for about two minutes, moving his car slightly forward before heading back toward the left side of the residence at 9:38:11.
- 9:36:18-9:36:48 (ZF, ZD, BP): Shortly after the third officer walks away from the back of the residence, the fifth officer follows, walking to the left of the house toward the street.
- 9:36:22-9:37:05 (ZF, ZD, ZP, BP, BR, BD): Officer Zahn[7] appears from behind the residence on the left, and he and Officer Boyer walk toward the street. They branch off, with Officer Zahn walking by the driver side of the Zahn squad car, and Officer Boyer walking by the passenger side of the Zahn squad car and into the front yard. They both walk to the street.
- 9:36:36 (B, Z): Someone radios dispatch that they have Beckett "in custody."
- 9:36:44-9:36:55 (BF, BD): A person identified by Lieutenant Abodeely as Officer Wombacher walks in front of the Boyer squad car. He is wearing jeans and a

---

[7] Officer Zahn walked closely enough to the Zahn driver side to identify him (compared to the video of him getting out of his vehicle earlier).

8

- light-colored plaid button-up with the sleeves rolled to three-quarter length, and his face can be seen clearly.
- 9:37:02-9:37:30 (ZF, ZD, BP): A uniformed officer (presumably Officer Hall) appears from behind the residence, leading K-9 Cooper by the collar along the left side of the house to the street.

The Zahn front video captures the left side of the house, including the back left corner of the house; it shows anyone who came and went to the back of the residence from the left side. The Zahn passenger side video captures the front of the house, front yard, and street; anyone who came from the street and walked down the right side of the house to access the back would be shown walking across the front yard on the Zahn passenger video. Once K-9 Cooper is led away from the scene at the back of the residence, he does not appear on the Zahn front or passenger videos. The Zahn front and passenger videos do not capture Officer Wombacher (as identified by Lieutenant Abodeely) going behind the residence until 9:38:37 (ZF), after K-9 Cooper had left the scene.

Beckett ultimately pleaded guilty to assault with a deadly weapon, a felony, based on his attempt to run over Officer Wombacher with his vehicle during the high-speed chase. Def. SOF; Pl. Resp. SOF. As part of his plea agreement in that case, Beckett admitted that he "continued to resist arrest through the entire process of handcuffing." Def. App. 63.

### *B. Discussion*

Defendant moves for summary judgment on Beckett's excessive-force claim under 42 U.S.C. § 1983. The parties agree that Beckett's only remaining claim involves Officer Hall's alleged use of excessive force when he caused K-9 Cooper to bite Beckett after he was already subdued, lying face down and handcuffed; the use of K-9 Cooper to apprehend Beckett while he was fleeing is not at issue. *See* Doc. 64-1 at 10; Doc. 69-1

9

Case 1:18-cv-00117-KEM   Document 73   Filed 08/03/21   Page 9 of 14

at 1-2. In moving for summary judgment, Defendant does not argue that if Beckett's deposition testimony is taken as true, the use of force (K-9 Cooper biting Beckett while handcuffed) was reasonable.[8] Doc. 64-1 at 10-12. Instead, Defendant argues that the video evidence affirmatively disproves Beckett's version of events. *Id.*

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant [a motion for] summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." For the plaintiff to avoid summary judgment, sufficient evidence must exist "on which the jury could reasonably find for the plaintiff." *Olmsted v. Saint Paul Pub. Sch.*, 830 F.3d 824, 828 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). The court "view[s] the record in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Soo Line R.R. Co. v. WernerEnters.*, 825 F.3d 413, 418 (8th Cir. 2016) (quoting *Bishop v. Glazier*, 723 F.3d 957, 960-61 (8th Cir. 2013)).

> But that does not mean [the court is] bound to credit the plaintiff's version of events, come what may. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Therefore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."

---

[8] The standard for a 42 U.S.C. § 1983 excessive-force claim is as follows:
> "[T]he test is whether the amount of force used was objectively reasonable under the particular circumstances." *Small v. McCrystal*, 708 F.3d 997, 1005 (8th Cir. 2013). Objective reasonableness is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The assessment "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.*

*Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018) (citation omitted) (bold emphasis added).

10

*Michael v. Trevena*, 899 F.3d 528, 532 (8th Cir. 2018) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

When a plaintiff's evidence amounts to "[m]ere allegations, unsupported by specific facts or evidence beyond [plaintiff]'s own conclusion, [he cannot] withstand a motion for summary judgment." ***Reed v. City of St. Charles, Mo.,*** 561 F.3d 788, 791 (8th Cir. 2009) (first and third alteration in original) (quoting ***Thomas v. Corwin,*** 483 F.3d 516, 527 (8th Cir. 2007)). In *Reed*, the plaintiff alleged that he cooperated during his arrest, after which officers kicked him, sprayed him with mace, and struck him in the head with a metal flashlight, causing him to lose consciousness. *Id.* at 790. The Eighth Circuit upheld summary judgment against the plaintiff, holding "nothing in the record . . . support[ed plaintiff's] allegations other than [plaintiff's] own . . . testimony," which was contradicted by the officers' deposition testimony, the officers' "contemporaneous incident report," and "a medical assessment conducted by an emergency-room physician shortly after [plaintiff's] arrest." *Id.* at 791. The court additionally relied on plaintiff's guilty plea to the felony of resisting arrest based on plaintiff's conduct that day: the court noted "[a]t no time during his guilty plea or sentencing . . . did [plaintiff] raise allegations of mistreatment by the [o]fficers effecting his arrest," and plaintiff's guilty plea under oath supported the officers' "assertions and [wa]s inconsistent with the statements made by [plaintiff] in his deposition." *Id.*

Here, as in *Reed*, Beckett offers only self-serving allegations to support his claim. Beckett does not offer any medical records showing K-9 Cooper bit him multiple times on different body parts after the takedown (as opposed to Cooper "holding his bite" as trained and as stated by the officers). In addition, other evidence in the record "blatantly contradicts" aspects of Beckett's testimony. Beckett testified that he stopped resisting arrest as soon as he was tackled to the ground. But as part of his plea agreement in the criminal case (and with the benefit of counsel), Beckett admitted that he "continued to resist arrest through the entire process of handcuffing." Def. App. 3.

11

The video evidence also contradicts Beckett's testimony. Beckett testified that after he was tackled[9] and handcuffed, Officer Wombacher yelled at him, then walked over to talk to Hall briefly, after which Hall caused K-9 Cooper to attack him. Defendant argues that the video evidence shows that Officer Wombacher was never behind the residence at the same time as K-9 Cooper (who left the area at 9:37:02). I agree. Although the house blocks the camera's view of the takedown and arrest, the videos capture the officers going to and from the street (where the squad cars are parked) to behind the residence. The video evidence demonstrates that K-9 Cooper was behind the residence with Beckett for less than two minutes. During that time, only four officers went behind the residence out of the camera's view: Officer Hall, Deputy Bonifazi, Officer Zahn, and the "third officer" on the scene. The "third officer" and K-9 Cooper were in the area behind the residence together for forty seconds (from 9:35:26 to 9:36:06). The "third officer" remained visible on camera from 9:35:26 to 9:35:39, and he appeared again from 9:35:51-9:35:52; at both those times, he was alone (i.e., he had not walked over to talk to Officer Hall). Even if the "third officer" were Officer Wombacher, the video evidence shows only an extremely narrow (perhaps impossible) window in which Officer Hall could have talked to him before siccing K-9 Cooper on Beckett.

In any event, there is no *genuine* dispute that the "third officer" is not Officer Wombacher. Lieutenant Abodeely identifies the "third officer" as Sergeant Welsh, not Officer Wombacher. And Lieutenant Abodeely identifies a different officer as Officer Wombacher. Beckett generally disputes these identifications, arguing that the video footage does not show clearly which officer is pictured. Although perhaps true about the "third officer," the video clearly shows the face and clothes of the person Lieutenant

---

[9] Beckett testified that Deputy Bonifazi tackled him, but he admits that the video evidence shows Officer Hall following him behind the residence most closely, followed by Deputy Bonifazi. Although possible that the officer who caught up to Beckett first (Officer Hall) was not the one to tackle him, it seems unlikely. This fact, when considered along with everything else, further bolsters the court's conclusion that no reasonable jury could credit Beckett's version of events.

12

Abodeely identifies as Officer Wombacher, and Beckett has not offered any evidence to rebut Lieutenant Abodeely's identification. The Zahn front and passenger-side videos show that Officer Wombacher—distinguishable from the other officers by his clothing—does not head to the area behind the residence until after K-9 Cooper has already left.

In addition, between the video and Lieutenant Abodeely's identification, Officer Wombacher's vehicle and personal movements can be tracked. Lieutenant Abodeely identifies Officer Wombacher's vehicle, a gray sports utility vehicle (SUV), in Boyer's front camera at 9:36:21. Just before that, using the Boyer rear camera and Zahn rear camera, the gray SUV can be seen turning down the street at 9:36:12 and coming to a full stop on the left of Officer Boyer's squad car. When the gray SUV arrives on the scene, the Boyer front video and Zahn rear video show that only one officer (the "third officer") is in the street area. The gray SUV comes to a stop, followed closely by a squad car. Using Boyer's driver-side camera, at 9:36:36, Officer Wombacher (distinguishable from the other officers by his light-colored shirt) can be seen rounding the rear of the gray SUV, as a uniformed officer rounds the front of the newly arrived squad car. Boyer's front camera shows that no one comes or leaves around the front of the gray SUV. And Zahn's rear video shows that Officer Wombacher did not come from elsewhere, like a vehicle parked further up the street or the back of the residence. The Boyer front camera captures the uniformed officer at 9:36:39, and Officer Wombacher at 9:36:45, walking across the street from the direction of the squad car and gray SUV. Officer Wombacher appears on the Boyer front camera for a few seconds (clearly visible and identified by Lieutenant Abodeely), until disappearing off screen at 9:36:51. The Boyer driver-side video and Zahn rear video show Officer Wombacher returning to the gray SUV by rounding the back of it (heading toward the driver-side door) at 9:36:54. The gray SUV is then driven down the block and parked in a residential driveway, and Officer Wombacher can be seen exiting via the driver-side door (identifiable by his light-colored shirt). 9:37:00-9:37:15 (ZR, BF).

13

Case 1:18-cv-00117-KEM   Document 73   Filed 08/03/21   Page 13 of 14

The video footage shows Officer Wombacher's movements during the one minute and forty seconds that Officer Hall and K-9 Cooper were behind the house with Beckett. The videos show that Officer Wombacher did not arrive on the scene until 9:36:12, and he remained in the street area until after K-9 Cooper had already left the area behind the residence at 9:37:02. The videos "blatantly contradict" Beckett's testimony that Officer Hall talked to Officer Wombacher behind the residence before causing K-9 Cooper to attack Beckett.

Plaintiff is correct that the videos do not show what happened when officers finally apprehended and handcuffed Beckett, since the camera view is blocked by a residence. But there are enough inconsistencies in Beckett's testimony that no reasonable fact finder could believe Beckett's version of events. *See Reed*, 561 F.3d at 791.[10] Defendant is entitled to summary judgment on Beckett's excessive-force claim.

### III. CONCLUSION

Defendant's motion to strike (Doc. 71) is **denied**. Defendant's motion for summary judgment (Doc. 64) is **granted**.

**IT IS SO ORDERED** this 3rd day of August, 2021.

Kelly K.E. Mahoney
Chief United States Magistrate Judge
Northern District of Iowa

---

[10] *See also* **McEuen v. Gleason**, No. 4:18-cv-00640 BRW-PSH, 2020 WL 5384929, at *4 (E.D. Ark. July 22, 2020) (discrediting plaintiff's testimony when multiple aspects of plaintiff's story were contradicted by video evidence); *LaCross v. City of Duluth*, No. CV 10-3922 (JNE/LIB), 2012 WL 1694611, at *8 (D. Minn. May 14, 2012) (discrediting plaintiff's testimony that officers tased him multiple times and threw him to the ground when plaintiff was admittingly very drunk, plaintiff misdescribed officers, and taser records showed taser was not discharged multiple times), *aff'd,* 713 F.3d 1155 (8th Cir. 2013).